UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:20-cv-00493-MOC-DCK

| | | |
|---|---|---|
| **CHERI MILLER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | ORDER |
| | ) | |
| **CHARLOTTE-MECKLENBURG SCHOOLS** | ) | |
| **BOARD OF EDUCATION**, | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on competing Motions for Summary Judgment. (Doc. Nos. 24; 26). Having considered both Plaintiff's and Defendant's motions and reviewed the pleadings, the Court grants Defendant's motion.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This dispute comes before the Court from an appeal under the Individuals with Disabilities Education Act ("IDEA"). During the 2018-2019 school year—the time the due process petition ("petition") was filed—J.M., the child seeking educational assistance, was a twelve-year-old enrolled in the 7th grade. (Doc. No. 18-1 at 8). In 2015, J.M. had been identified as a child with disabilities under Section 504 of the Rehabilitation Act of 1973 ("Section 504") and has been provided assistance accordingly. (Id. at 10).

Petitioner C.M. has submitted eight referrals to CMS requesting that J.M. be evaluated for special education needs under the IDEA. (Doc. No. 18-2 at 12). Pursuant to each request, an individualized Education Plan ("IEP") team met and conducted an Initial Referral meeting to determine whether an evaluation for special education was needed. (Id.). The teams decided to conduct an evaluation on four occasions, and on all of these occasions J.M. was found not eligible

-1-

for special education. (Id.). The instant case arises from the last of these evaluations. (Id.). C.M. attended the IEP meeting on this evaluation and participated in the meeting. (Id. at 26-29). C.M. presented the team with a new diagnosis of Autism Spectrum Disorder with language and cognitive impairment. (Id. at 24). At the meeting, the team conducted an evaluation of J.M. to determine eligibility under the new diagnosis. (Id. at 16-25). The team determined evaluations were needed in the following areas: adaptive behavior, education, speech-language, vision and hearing screenings, observation, occupational therapy, and Autism rating scales. (Id.). C.M. consented to these evaluations. (Id.). No additional evaluations were requested by C.M. (Id. at 26-29).

Upon the completion of these tests, CMS convened another IEP team meeting to review the new information. (Id. at 34). The team used numerous assessment tools and discussed J.M.'s strengths, needs, evaluations, observations, work samples, and grades, in addition to considering teacher and parent testimonials. (Id. at 34-36). The team determined J.M. did not meet three out of the four requirements for having an impairment under the category of Autism. (Id. at 34). The team also concluded that a disability did not affect J.M.'s education performance. (Id.). The team determined J.M. did not qualify for special education services. (Id.). The team noted that, despite the diagnosis, J.M. "does not demonstrate the need for specially designed instruction as the team did not have data to indicate that this had a negative educational impact on his academic and functional performance at school." (Id. at 35).

C.M. then requested Independent Educational Evaluations ("IEEs"), and CMS approved the request for IEEs in education, autism, speech/language, occupational therapy, and adaptive behavior evaluations. (Doc. No. 18-1 at 13). Another IEP team meeting was convened to discuss the results of these tests, and another evaluation was opened for J.M. (Id.).

C.M. then filed a petition on the grounds that CMS "failed to provide the student with a Free and Appropriate Public Education ('FAPE') during the 2018-2019 school year." (Id. at 7). C.M. alleged the following:

- Count 1: Child Find Violation;

- Count 2: Failure to Follow 90 Day Statutory Timeline for Initial Evaluation;

- Count 3: Use of a Single Measure in Eligibility Decision;

- Count 4: Failure to Assess Specific Learning Disability;

- Count 5: Failure to Follow Private Evaluation Recommendation;

- Count 6: Failure to Create and Implement an IEP; and

- Count 7: Failure to Provide IEE's.

(Id. at 13-16). The Administrative Law Judge ("ALJ") granted CMS' Motion for Summary Judgment on all seven counts, plus a count not specifically raised in the petition. (Doc. No. 18-6 at 109-10). The State Review Officer ("SRO") affirmed the ALJ's decision. (Id. at 121-25). The SRO also determined that the arguments raised by C.M. for the first time at the appeal level were not reviewable because the SRO can only review decisions made by the ALJ. (Id. at 125-26).

C.M. filed the Complaint in this matter on September 9, 2020. (Doc. No. 1). Both parties filed a Motion for Summary Judgment on March 28, 2021. (Doc. Nos. 24; 26).

## II.     STANDARD OF REVIEW

### a.  District Court Review Under the IDEA

The Court, when reviewing IDEA actions, "(i) shall receive the records of the administrative proceeding; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). Essentially, the Court conducts a modified *de novo*

review where the Court assumes findings of fact made in the administrative proceedings are *prima facie* correct, but may stray from these findings with a proper explanation as to why the Court disagrees. G ex rel. RG v. Fort Bragg Dependent Schs., 343 F.3d 295, 302 (4th Cir. 2003).

The Court must not substitute its own "notions of sound education policy for those of local school authorities." J.H. ex rel. J.D. v. Henrico Cnty. Sch. Bd., 326 F.3d 560, 566 (4th Cir. 2003). Since North Carolina utilizes a two-tiered administrative review process, this Court will give due weight to the credibility determinations of the SRO. Doyle v. Arlington Cnty. Sch. Bd., 953 F.2d 100, 104-05 (4th Cir. 1991). The Court will give no deference to either the SRO or the ALJ's conclusions of law. R.S. v. Bd. of Directors of Woods Charter Sch. Co., No. 1L16-CV-119, 2019 WL 1025930, at *3 (M.D.N.C. March 4, 2019); see E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of Educ., 975 F.Supp.2d 528, 537 (M.D.N.C. 2013), aff'd E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. Of Educ., 773 F.3d 509 (4th Cir. 2014).

"After giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute." Doyle, 953 F.2d at 105.

### b. North Carolina Summary Judgment Standard

Summary judgment is a proper mechanism for the ALJ and SRO to decide IDEA disputes because the Rules of Civil Procedure—which allow for summary judgment—apply in IDEA proceedings. N.C. GEN STAT. § 115C-109.6(A); see 26 NCAC 03.0101 et seq. Summary judgment is appropriate when "the pleadings … show no genuine issue of material fact exists and [the moving party] is entitled to judgment as a matter of law." N.C. GEN. STAT. § 1A-1, Rule 56(c).

The moving party can show there is no genuine issue of material fact in two different ways: by showing "that an essential element of the opposing party's claim is nonexistent or by showing

-4-

through discovery that the opposing party cannot produce evidence to support an essential element of his claim." Zimmerman v. Hogg & Allen, 209 S.E.2d 795, 798 (N.C. 1974). Once the moving party meets this burden, the non-moving party can defeat the summary judgment motion by "produc[ing] a forecast of evidence demonstrating specific facts … showing that the [non-moving] party can at least establish a prima facie case at trial." Pacheco v. Rogers & Breece, Inc., 579 S.E.2d 505, 507 (N.C. Ct. App. 2003). A party "may not rest upon the mere allegations or denials of [their] pleading, but [their] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." N.C. R. Civ. P. 56(e). Conclusory statements provided in an affidavit—without more—lack the specificity required to show that there is a genuine issue of material fact. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 875 (1990).

## III. DISCUSSION

The IDEA was originally enacted in 1970 with the purpose of providing a FAPE to students who are determined to need a specialized learning curriculum. Forest Grove Sch. Dist. V. T.A., 557 U.S. 230, 238 (2009). States that receive federal funds must provide eligible students with a FAPE that "consists of education instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." M.S. v. Fairfax Cnty Sch. Bd., 553 F.3d 315, 319 (4th Cir. 2009) (quoting Bd. of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley, 458 U.S. 176, 188-89 (1982)).

To be eligible for a FAPE, a child must be "a child with a disability" *and*, as a result of the disability, "needs special education and related services." 20 U.S.C. § 1401(3)(A); 34 C.F.R. 300.8(a)(1); 34 C.F.R. 300.300. "IDEA confers the right to a FAPE only upon children with disabilities. … Conversely, if a student is not a child with a disability, then the student is not

entitled to a FAPE under the IDEA." <u>Durbrow v. Cobb Cnty. Sch. Dist.</u>, 887 F.3d 1182, 1193 (11th Cir. 2018) (internal quotations omitted). Under the IDEA, the phrase "child with a disability" is a misnomer because the IDEA defines a "child with a disability" as a child who has been diagnosed with a qualifying disability *and* requires special education and related services as a result of the disability. <u>A.P. v. Woodstock Bd. of Educ.</u>, 572 F. Supp. 2d 221, 237 (D. Conn. 2008), *aff'd sub nom* <u>A.P. v. Woodstock Bd. of Educ.</u>, 370 F. App'x 202 (2d Cir. 2010) (unpublished). Thus, the diagnosed disability by itself is not sufficient for a child to be a "child with a disability" under the IDEA. <u>See</u> <u>id.</u>

Qualifying students are provided a FAPE through an Individualized Education Plan ("IEP"). 20 U.S.C. §§ 1401(9)(D), 1414(d). This IEP "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the type of services to be provided, and establish objective criterial for evaluating the child's progress." <u>MM ex rel. DM v. Sch. Dist. of Greenville Cnty.</u>, 303 F.3d 523, 527 (4th Cir. 2002).

All states that receive federal funds under IDEA must "establish and maintain procedures … to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE]." 20 U.S.C. § 1415(a). North Carolina provides a two-tiered administrative review process: first, an ALJ oversees proceedings at the hearing level; second, if a party disagrees with the result the ALJ reached, the party can appeal to a State Review Officer ("SRO") for a review of the ALJ's decision. N.C. GEN. STAT. § 115C-109.6. After this process has been exhausted, the party may bring an action in a federal district court. 20 U.S.C. § 1415(i)(2)(A).

When a court reviews allegations of procedural violations, "to the extent that the procedural violations did not actually interfere with the provision of a free appropriate education, these

violations are not sufficient to support a finding that an agency failed to provide a free appropriate education." Gadsby v. Grasmick, 109 F.3d 940, 956 (4th Cir. 1997). Moreover, a procedural violation "may not serve as the basis for recovery unless it resulted in the loss of an education opportunity for the disabled child." T.B. v Prince George's Cnty. Bd. of Educ., 897 F. 3d 566, 573 (4th Cir. 2018) (citation omitted).

The Court will address each alleged count in order, and then address any arguments not specifically raised in the petition.

### a. Count One: Child Find Violation

The ALJ and SRO were correct in granting Summary Judgment to CMS on Count One. The IDEA's Child Find provision requires a school district to evaluate a child that the school district suspects has a disability and needs special education as a result of the disability. 20 U.S.C. §§ 1401(3)(A), 1412(a)(3)(A); 34 C.F.R. § 300.111(c). The school district must evaluate the child, but there is no requirement that the school district find that the child is eligible for special education. See T.B. v. Prince George's Cnty. Bd. of Educ., 897 F. 3d at 574 (stating that not all children experiencing academic difficulties are eligible for special education).

For the Court to sustain C.M.'s Child Find claim, C.M. must show that the school district "overlooked clear signs of disability and [was] negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." Sch. Bd. of City. of Norfolk v. Brown, 769 F. Supp. 2d 928, 942 (E.D. Va. 2010) (citing Bd. of Educ. of Fayette Cnty., Ky. v. L.M., 478 F.3d 307, 313 (6th Cir. 2007)). A school district meets its Child Find duty "by initiating the IDEA-eligibility process." Durbrow v. Cobb Cnty. Sch. Dist., 887 F.3d 1182, 1196 (11th Cir. 2018).

In the instant case, there can be no serious contention that this process was not initiated based on the following events: (1) CMS granted C.M.'s request for an evaluation that was limited

-7-

to the diagnosis of Autism Spectrum Disorder; (2) the school district commenced an IEP team meeting where new information and C.M.'s concerns were considered; (3) the IEP team agreed to a formal evaluation of J.M. and ordered six screenings and tests, including the following: adaptive behavior evaluation, educational evaluation, speech-language evaluation, vision and hearing screenings, motor/occupational therapy evaluation, and Autism rating scales; (4) the IEP team reconvened to consider the new results of the ordered evaluations and to determine eligibility for special education; (5) after this meeting, C.M. requested more IEE's and the IEP team approved several of them; and (6) after the IEEs were completed, the IEP team reconvened again to further evaluate J.M. (Doc. No. 18-1 at 11-13).

Since the IDEA-eligibility process was initiated through the convening of the IEP and subsequent evaluations, the Child Find requirement was met. Furthermore, it cannot be said that the district "overlooked clear signs of disability and [was] negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate" because evaluations were clearly conducted.

Despite C.M.'s arguments that the Child Find requirement was not met, C.M. has not provided a forecast of evidence to prove otherwise. C.M. contends that the January 16, 2019 psychological report is evidence of conflicting information and a failure of CMS to provide a comprehensive evaluation. (Doc. No. 30 at 14). However, the conclusion of the evaluation clearly stipulates that "new testing data does not suggest that [J.M.] needs specially designed instruction to be successful in his classes." (Doc. No. 18-5 at 77). The difference in the results of the behavior rating scales between the C.M. and J.M.'s teachers was noted in the report, but ultimately the psychologist concluded no help was needed. (Id.). Furthermore, all of the evidence C.M. offers to prove CMS did not fulfill its Child Find obligation was considered by the IEP team. (Doc. No. 18-

5 at 35-38). The psychologists and the IEP team are the experts in this arena and the Court will defer to their reasoned assessments.

Lastly, "[w]hen a school district uses measures besides special education to assist struggling students, it is even less likely in breach of its child-find duty." Durbrow, 887 F.3d at 1196. Here, J.M. was receiving assistance under Section 504 and the plan was modified during the 2018-2019 school year to accommodate his new diagnosis of autism. (Doc. No. 18-1 at 10-12); (Doc. No. 18-2 at 13, 31-32). Thus, it is even more likely the Child Find requirement was satisfied as CMS was offering J.M. assistance outside of a special education plan.

### b. Count Two: Failure to Follow 90 Day Statutory Timeline for Initial Evaluation

The ALJ and SRO were correct in granting Summary Judgment to CMS on Count Two. C.M. is correct in stating that a procedural violation occurred: North Carolina law requires an eligibility determination to be completed within 90 days of the referral, but CMS made the determination 110 days after the referral. See North Carolina Department of Public Instruction: Exception Children Division, Policies Governing Services for Children with Disabilities, section 1503-2.2(c)(1) (last visited July 24, 2021, 11:34 AM), https://files.nc.gov/dpi/documents/publications/catalog/ec144-policies-governing-services.pdf (hereinafter "NC Policies"). However, if the procedural violation did not deny the child a FAPE, there is no violation. R.F. v. Cecil Cnty. Pub. Sch., 919 F.3d 237, 246 (4th Cir. 2019). Since the IEP team did not determine J.M. was eligible for a FAPE during the meeting, there was no loss of education opportunity resulting from this delay. C.M. has not shown how the result of the IEP was impacted by the delay other than conclusively stating that the delay constituted denial of a FAPE. (Doc. No. 30 at 19-21).

### c. Count Three: Use of a Single Measure in Eligibility Decision

The ALJ and SRO were correct in granting Summary Judgment to CMS on Count Three. Under the IDEA, the IEP team must use multiple sources of data to gather relevant functional, developmental, and academic information about the child. 20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304(b). This includes information provided by the parent. 20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.304(b). In making a disability determination, the IEP team must "[d]raw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior." 34 C.F.R § 300.306(c). School districts must "not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability." 34 C.F.R. § 300.304(b)(2). To reiterate, the Court is not in a position to question the educational policy determinations made by local school officials. See J.H. ex rel. J.D. v. Henrico Cnty. Sch. Bd., 326 F.3d at 566. However, the Court will ensure the school district followed the law by not considering only one measure of data in its determination.

In the instant case, the determination was made at the January 16, 2019 IEP team meeting. (Doc. No. 18-2 at 34-37). Since this count is challenging this specific determination, the inquiry is confined to what was considered by the IEP team at the January 16 meeting.

The record clearly shows that the IEP team relied on multiple measures of data in making J.M.'s eligibility determination. (Doc. No. 18-2 at 10, 13-14, 34, 49-50). To illustrate, the Prior Written Notice ("PWN") references and discusses the following sources: adaptive behavior evaluations, educational evaluations, observations (including observations from C.M.), psychological evaluations, social developmental history, speech/language evaluations, vision and hearing screenings, occupational therapy evaluation, autism rating scales, parent input, and

-10-

classroom date including current and past grades, anecdotal notes, test scores, and more. (Doc. No. 18-2 at 34-36). Even the discussion of J.M.'s academics—which is just one area that was evaluated—expanded beyond grades: the IEP team discussed J.M.'s scores on the Woodcock Johnson IV, J.M.'s formal educational evaluation, and his grades. (Id. at 34). This PWN was signed by nine other IEP team members who were at the meeting. (Id.). Two of the team members, Teresa Mead-Katsoudas, who is the School Psychologist, and Andrea Lynn King, the Exceptional Children's Itinerant Coordinating Teacher, submitted affidavits confirming the PWN's accuracy. (Id. at 13).

In contrast, the only direct evidence put forth by C.M. in opposition consists of unsubstantiated conclusions and a statement from C.M. stating that J.M.'s educational performance was discussed in terms of grades. (Doc. No. 30 at 21-25). C.M. also argues that a psychologist who evaluated J.M. found an eight-year delay in J.M.'s receptive and expressive language. (Doc. No. 30 at 22). However, this evaluation was completed four months after the January IEP meeting. (Doc. No. 18-2 at 28). Thus, that evaluation cannot speak to what was considered by the IEP team at the January meeting. C.M. attempts to argue that had the IEP team considered all of the evidence, the team would have found the delay the psychologist discovered in that later evaluation. (Doc. No. 30 at 22). Such an argument is merely conclusory, essentially stating that the IEP team did not consider the evidence because they would have reached a certain result if they did. The implications of the psychologist's findings are also unclear, as the evaluation was done informally after formal evaluations need to be stopped. (Doc. No. 18-6 at 59). The formal evaluation needed was stopped because "J.M. began repeating 'I don't know' and it became difficult to determine whether he genuinely did not know the answer or simply did not want to respond." (Id.).

-11-

C.M.'s affidavit and conclusory arguments do not rise to the level of specificity required to create a genuine issue of material fact. <u>See</u> <u>Lujan</u>, 497 U.S. at 875 (stating that conclusory statements provided in an affidavit—without more—lack the specificity required to show that there is a genuine issue of material fact); <u>see</u> <u>also</u> <u>Pacheco</u>, 579 S.E.2d at 507; N.C. R. Cɪv. P. 56(e).

Lastly, C.M.'s own pleadings contradict the claim that CMS only relied on one measure. In C.M.'s request for a due process hearing, C.M. stated that "CMS has noted receipt of the evaluations and has documented the Student's diagnosed disabilities . . . CMS did not provide special education for the Student's diagnosis of autism due to teacher observations being different from the observations of medical professionals and the Parent." (Doc. No. 18-1 at 15). By conceding that the IEP team made the determination "due to teacher observations being different from the observations of medical professionals and the Parent," C.M. undermines her own argument that the IEP team only relied on J.M.'s grades.

Thus, Summary Judgment on Count Three in favor of CMS was proper.

### d. Count Four: Failure to Assess Specific Learning Disability

The ALJ and SRO properly dismissed Count Four because it was barred by the statute of limitations.

A petition for a due process hearing must "set forth an alleged violation that occurred not more than one year before the party knew or reasonably should have known about the alleged action that forms the basis of the petition." N.C. Gᴇɴ. Sᴛᴀᴛ. § 115C-109.6(b). For IDEA claims, the statute of limitations accrues from the date when the parent knew of the alleged "injury or the event that is the basis for their claim." <u>R.R. v. Fairfax Cnty. Sch. Bd.</u>, 338 F.3d 325, 332 (4th Cir. 2003).

Count Four alleges that CMS wrongfully confined its decision to J.M.'s autism diagnosis. C.M. filed the petition on December 2, 2019 for alleged violations "during the 2018-2019 school year." (Doc. No. 18-2 at 6). C.M. attended an IEP meeting on October 16, 2018, where the team completed a Special Education Referral for an evaluation, which identified "autism" as the potential area of eligibility. (Doc. No. 18-2 at 26). The PWN—delivered to C.M. two days after the meeting—explicitly stated the evaluations were being conducted to gauge J.M.'s eligibility under J.M.'s diagnosis of Autism Spectrum Disorder. (Id.). C.M. participated in the formulation of the PWN as well. (Id. at 28). C.M. was also given a "Handbook on Parents' Rights" that details C.M.'s rights to challenge the IEP team's decision. (Id. at 30). Therefore, since C.M. knew or should have known in October 2018 that the IEP team was only evaluating J.M. for eligibility under J.M.'s diagnosis of Autism Spectrum Disorder, Count Four is barred by the statute of limitations.

### e. Counts Five and Six: Failure to Follow Private Evaluation Recommendation and Develop an IEP

The ALJ and SRO properly granted Summary Judgment to CMS on Counts Five and Six. As the SRO correctly noted, the allegations in Count Five and Six are encapsulated in the preceding counts.

Count Five alleges that the IEP team wrongfully failed to follow the recommendations of private evaluators in its FAPE determination. However, as discussed above, the IEP team does not consider just one source of information; the IEP team considers all of the evidence in order to make a decision. NC Policies 1503-2.7(c)(1). The private recommendations are just that: *recommendations*. Failure to follow a private recommendation, therefore, is not a violation of the IDEA.

-13-

Likewise, Count Six alleges that the IEP team wrongfully failed to develop an IEP. As discussed above, the Child Find requirement does not require the IEP team to conclude that the child has a disability; rather, it requires the IEP team to take certain steps to determine whether the child has a disability. See T.B. v. Prince George's Cnty. Bd. of Educ., 897 F. 3d at 574. Thus, the IEP team did not violate the IDEA when it determined that J.M. did not have a disability. Additionally, since J.M. was not found to have a disability by the IEP team, the IEP team was under no obligation to develop an IEP.

### f. Count Seven: Failure to Provide IEE's

The ALJ and SRO correctly granted Summary Judgment in favor of CMS on Count Seven. C.M.'s seventh count alleges that CMS wrongfully denied C.M.'s request for CMS to provide IEEs at public expense in the following areas: psychological, functional behavior, and assistive technology. Section 1504-1.3(b) of the *NC Policies* states that a parent only has a right to an IEE at public expense when "the parent disagrees with an evaluation obtained by the LEA." See also 34 C.F.R. § 300.502(b); Lauren W. v. DeFlaminis, 480 F.3d 259, 275 (3d Cir. 2007) (stating parents do not have a right to reimbursement for an evaluation they obtained because the parents had expressly agreed with the prior evaluation). Furthermore, the "parent's right to an IEE is intended to equip them with a competing expert opinion to counter an assessment with which they disagree, and to ensure that both assessments are considered in crafting an IEP for their child." Linda Unified Sch. Dist. 112 LRP 41903 (SEA CA 2012).

In the instant case, C.M. requested IEEs in the following areas: psychological, educational, speech/language, occupational therapy, assistive technology, adaptive behavior, functional behavioral assessment, and autism. (Doc. No. 18-1 at 13). CMS only denied the psychological evaluation, assistive technology evaluation, and functional behavioral assessment.

The claim regarding the psychological evaluation is now moot because CMS allowed for a psychological evaluation IEE in August 2019. (Doc. No. 18-1 at 13). C.M. contends that this is not sufficient because the doctor who performed the evaluation neglected to complete a portion of it, but this contention disregards the fact that CMS allowed for another IEE to correct the mistakes. (Doc. No. 18-6 at 48). This report was completed on December 16, 2019. (Id.). Therefore, this claim is now moot because the requested relief has been provided.

C.M. is also not entitled to the Functional Behavior and Assistive Technology IEEs. There is no record of the IEP team having conducted these evaluations prior to C.M.'s request. Therefore, there is no evaluation that these potential IEE's would be disagreeing with, as the statute requires. See NC Policies 1504-1.3(b); see also Kirkpatrick v. Lenoir Cnty. Bd. of Educ., No. 4:97-CV-168-BO(1), 1999 WL 1939984, at *6 (M.D.N.C. Mar. 31, 1999) (stating that the statute requires the IEE be the result of a disagreement); P.L. ex rel. Liuzzo v. Charlotte-Mecklenburg Bd. of Educ., No. 3:07-CV-170-GCM, 2010 WL 2926129, at *6 (W.D.N.C. July 13, 2010) (stating "[i]f a child's parents disagree with the school system's evaluation, they have a right to obtain an [IEE]").

Furthermore, neither of these two evaluations are required to determine eligibility under any category of disability—including Autism Spectrum Disorder. See NC Policies 1503-2.5(d)(1-14). The Functional Behavior evaluation is only mentioned in relation to changing a child's educational placement for disciplinary reasons, and the Assistive Technology evaluation is only mentioned in relation to a child that has already been diagnosed as a "child with a disability." See 34 C.F.R. § 300.520; see also 34 C.F.R. § 300.6; NC Policies 1504-2.1. Since J.M.'s situation does not fall under either of these categories, CMS was not required to issue these IEEs. Therefore, there has been no violation for failing to issue these IEEs.

C.M. argues that an IEE was required because "[t]he child is [to be] assessed in all areas related to the suspected disability." NC Policies 1503-2.5(c)(4). However, the language that sets forth the availability of an IEE is clear: an IEE is *only* available when the parent disagrees with an evaluation obtained by the school district. Id. at 1504-1.3(b)(1). Thus, C.M. does not have a right to an IEE in these two areas since there is no evaluation obtained by CMS with which C.M. disagrees. If there is any violation here, it may be CMS' failure to assess C.M. "in all areas related to [Autism Spectrum Disability]." See NC Policies 1503-2.5(c)(4). However, this is not what C.M. has argued and, therefore, the Court does not have the authority to hear the claim as it has not been administratively exhausted as the IDEA requires. 20 U.S.C. § 1415(i)(2)(A).

Even if failing to provide these two IEEs were a procedural violation, C.M. has not detailed how the failure to provide IEEs—that are not required for a diagnosis under Autism Spectrum Disorder—denied J.M. a FAPE. See NC Policies 1503-2.5(d)(1); see also Gadsby, 109 F.3d at 956 (requiring a procedural violation to result in the denial of a FAPE in order for the denial to be actionable).

### g. Plaintiff's Parental Disenfranchisement Claim

Plaintiff—on appeal only—has made a claim regarding "parental disenfranchisement." (Doc. No. 27 at 20). This claim appears to be an umbrella under which Plaintiff asserts a multitude of other claims. The first claim, alleging a "[c]ontinual failure to comprehensively evaluate the student, and discounting evaluations provided by the parent," is simply a repeat of the arguments made in Counts One, Three, and Five. (Doc. No. 27 at 21-22). The second claim, "[d]enial of Parent's right to participate in the evaluation process," is a repeat of the arguments made in Count Three. (Id.).

-16-

The third claim, "[d]efendant failed to initiate a hearing against the Parent to deny [IEE]," is distinct from the others brought in the Petition, but it must fail for this exact reason: the events giving rise to the claim occurred before this due process petition was filed, and, thus, must be administratively exhausted. The IDEA requires a complaining party to exhaust their administrative remedies before bringing an action in a federal district court. E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d at 513-14. Since this issue was not raised in the original petition, (Doc. No. 18-1 at 13-16), C.M. did not exhaust North Carolina's two-tiered administrative process. Therefore, the Court cannot hear this claim. Furthermore, even if it were properly before the Court, Plaintiff's argument that CMS violated 34 C.F.R. § 300.502.(b)(2) would fail. That regulation states that when an IEE request is denied, a due process hearing must be initiated by the school district "to show its evaluation is appropriate." 34 C.F.R. § 300.502.(b)(2). As the Court has already discussed, the IEEs requested were not disagreeing with an evaluation conducted by the school district, and thus, the school district could not possibly "show its evaluation is appropriate." Id. Therefore, this regulation presupposes that there is a pre-existing evaluation conducted by the school district with which Plaintiff disagrees. This regulation, then, is inapplicable to the instant case because there is no pre-existing evaluation for the denied IEEs.

The fourth claim, "[d]enial of the Parent's right to participate in the development of an appropriate program," is a repeat of the arguments made in Count Three. (Doc. No. 27 at 23).

The fifth claim is a continuation of the previous argument that "[t]he ALJ contributed to Parental Disenfranchisement by denying the Parent a hearing." (Id. at 23-24). Plaintiff also argues that, since Plaintiff is allowed to submit evidence up until five days before the date of the hearing, the ALJ deprived Plaintiff of her due process rights by granting summary judgment. (Doc. No. 27

-17-

at 18-19, 23-24). This fifth claim is more complex and will be discussed in the next section of this Order.

The sixth claim under the "parental disenfranchisement" umbrella, arguing that "[t]he ALJ contributed to the Parent [sic] Disenfranchisement by failing to find the District did not initiate [a] hearing to defend its own evaluations and shifting the burden of proof to the parent," is a repeat of the third claim under this umbrella. (Doc. No. 27 at 24). The seventh claim, arguing that "[t]he ALJ further disenfranchised the Parent by issuing an incompetent decision," is simply challenging the ALJ's ruling generally, which is the entire purpose of this appeal. (Id. at 24-25). The eighth claim, arguing that "[p]rocedural violations were raised, and the ALJ failed to address them," repeats the arguments made in Count Two. (Id. at 25). In the ninth claim, titled "[t]he ALJ ignored evidence presented demonstrating J.M.'s need for classification," C.M. accuses the ALJ of racism—which C.M. does not provide support for. (Id. at 25-26).

### h. Plaintiff's Hearing, Cross-Examination, and Five-Day Rule Claims

In arguing for parental disenfranchisement, Plaintiff contends she suffered the following procedural harms: wrongfully denied a hearing, wrongfully denied the right to cross examine witnesses, and wrongfully denied the right to file more evidence within five days of the scheduled summary judgment hearing. In other words, Plaintiff contends that the ALJ violated procedural rights in issuing its summary judgment decision. The Court disagrees.

The IDEA is spending clause legislation, Va. Office of Prot. & Advocacy v. Va., Dep't of Educ., 262 F. Supp. 2d 648, 658 (E.D. Va. 2003), meaning that "states accepting federal funds [must] provide a free appropriate public education to students with disabilities." K.D. v. Starr, 55 F. Supp. 3d 782, 784 (D. Md. 2014); see also Alexander S. v. Boyd, 876 F. Supp. 773, 800 (D.S.C. 1995). As a condition of the receipt of federal funds, the IDEA requires that "[a]ny State

educational agency, State agency, or local educational agency that receives assistance . . . shall establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies." 20 U.S.C. § 1415(a).

In North Carolina, the State Board of Education (through DPI) is the State Education Agency ("SEA") designated to establish, maintain, and implement the procedural safeguards guaranteed under the IDEA. Like other states, North Carolina utilizes a two-tier system of review to resolve due process petitions in special education cases. See E. L. v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 513-14 (4th Cir. 2014) (explaining North Carolina's two-tiered system of resolving special education disputes).

The North Carolina General Assembly assigned responsibility for conducting the first tier of special education due process hearings to the Office of Administrative Hearings (OAH). N.C. GEN. STAT. § 115C-109.6(a). Subsequently, the State Board of Education, on behalf of DPI, entered into a Memorandum of Understanding ("MOU") with OAH delegating jurisdiction to conduct all special education due process hearings arising under 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.511 and 300.532. N.C. GEN. STAT. § 115C-109.6(j).

Under the IDEA, parents have "an *opportunity* to present a complaint with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child...." 20 U.S.C. § 1415(b)(6) (emphasis added); see also K.A. v. Fulton Cnty. Sch. Dist., 741 F.3d 1195, 1207 (11th Cir. 2013) (recognizing that Congress amended the IDEA in 2004 to clarify that a parent has an "*opportunity*," to present a complaint and have a due process hearing, not an unqualified right) (emphasis added). Under IDEA procedures, "[i]f the local educational agency has not resolved the complaint to the

-19-

satisfaction of the parents within 30 days of the receipt of the complaint," then a "due process hearing *may* occur…." 20 U.S.C. § 1415(f)(1)(B)(ii) (emphasis added). *At the due process hearing*, parents and the local education agency have a right to certain procedural safeguards provided by the IDEA, including "the right to present evidence and confront, cross-examine, and compel the attendance of witnesses." 20 U.S.C. § 1415(h)(2); see K.A. v. Fulton Cnty. Sch. Dist., 741 F.3d at 1203-04 (recognizing that the procedural rights to "present evidence and confront, cross-examine, and compel the attendance of witnesses" are procedural rights that apply "at any 'impartial due process hearing'").

In North Carolina, once a due process complaint is filed with OAH, it is subject to the administrative rules governing the Hearings Division at OAH, including Rule 56 under the North Carolina Rules of Civil Procedure. See 26 NCAC 03.0101 et seq. ("Rules of Civil Procedure as contained in G.S. 1A-1…shall apply in contested cases in [OAH] unless another specific statute or rule of the Office of Administrative Hearings provides otherwise."). Under OAH rules, ALJs are vested with the authority to regulate the course of a hearing, including the authority to conduct discovery, hear and rule on motions, issue orders regarding prehearing matters, and to make preliminary, interlocutory, or other orders as deemed appropriate. (See Doc. No. 29, Ex. A). Thus, a parent's opportunity to be heard at an impartial due process hearing conducted under IDEA is predicated on their ability to survive pre-hearing dispositive motions allowed under the North Carolina Rules of Civil Procedure, such as a motion to dismiss or a motion for summary judgment.

North Carolina's administrative system for due process is not unique in this regard. Summary judgment as a mechanism for pre-hearing relief is recognized by other states administering the procedural safeguards of the IDEA. See, e.g., Cobb Cnty. Sch. Dist., 71 IDELR 22 117 LRP 33902; In re: Student with a Disability Iowa St. Educ. Agency, 116 LRP 36824;

Highlands Cnty. Sch., 117 LRP 35717 (summary judgment granted where there was no dispute as to material facts that school district complied with applicable regulations); Edison Twp. Bd. of Educ., 118 LRP 490 (no material dispute of fact on underlying allegations).

Plaintiff presents no controlling authority to support the assertion that a parent must be given the right to confront, cross-examine, and compel the attendance of witnesses in all IDEA cases under 20 U.S.C. § 1415(h). The only case submitted by Plaintiff to advance this argument is S.W. v. Florham Park Bd. of Educ., Civil Action No. 15-7842 (MAH), 2017 U.S. Dist. LEXIS 79510 (D.N.J. May 24, 2017), a district court case from the Second Circuit, which is procedurally and factually distinguishable from this case.

There are two (2) critical distinctions between S.W. and this case. First, under New Jersey law, the board of education, not the parent, has the burden of proof at due process hearings in IDEA cases. S.W., at *13-14. In fact, this is the antithesis of North Carolina's law and Fourth Circuit precedent. See Shaw v. Weast, 364 F. App'x 47, 49 (4th Cir. 2010) (unpublished) (holding that in the Fourth Circuit the parent bears the burden of proof in due process proceedings brought under the IDEA). Second, the administrative hearing officer's summary judgment ruling in S.W. was reached during a full due process hearing with live witnesses, following the presentation of the school board's case-in-chief, not as part of a pre-trial summary judgment hearing, as in this case. S.W. at *4.

In S.W., the parent of a child with a disability filed a due process complaint alleging various violations of the IDEA. Id. at *3. An ALJ held a due process hearing between the parties. Id. No pre-hearing motion for summary judgment was ever filed or litigated by either party in S.W. During its case-in-chief, the school board presented the testimony of three professional educators knowledgeable about the child's performance. Id. at *4-10. At the conclusion of the school board's

case, but prior to the parent's case-in-chief, the parent made a motion for summary judgment, arguing that the school board had failed to meet its burden of proof. Id. at *3-4. The parties agreed to continue the due process hearing without resolution on the summary judgment motions. Id. Subsequently, the parent began the presentation of her case-in-chief and called its first witness to testify. Id. Before the parent could present additional witnesses, the ALJ ruled in favor of the school board. Id. at *3-6. Thus, the school board was able to present its full case before the summary judgment ruling, and the parent was denied the opportunity to present its own evidence. Unsurprisingly, the ALJ's ruling was overturned by a New Jersey federal district court judge as a denial of the parent's procedural rights during the IDEA due process hearing. Id. at *23-24.

The same element of unfairness is absent in this case. Unlike S.W., Plaintiff was not prevented from bringing forth the sworn testimony of material witnesses at a due process hearing. (See Doc. No. 27, at 12-14). Here, Plaintiff failed to survive summary judgment before the due process hearing. In this case, a due process hearing was scheduled to commence on June 15, 2020. (Doc. No. 18-1 at118-123). Before the start of the due process hearing, CMS moved for summary judgment, seeking the dismissal of all of Plaintiff's claims filed at OAH as a matter of law. (Doc. No. 18-1 at 124-134; Doc. No. 18-2 at 1-52). As a result, the ALJ continued the due process hearing until August 10, 2020, and granted Plaintiff an additional fifteen days to file a response in opposition to CMS' summary judgment. (Doc. No. 18-1 at 52-61). Plaintiff thereafter submitted a written brief in opposition to CMS' summary judgment motion, along with her own supporting affidavits and documentary evidence, appeared at a hearing through counsel, and presented oral argument to the ALJ. (Doc. No. 18-2 at 62-134; Doc. No. 18-7 at 1-36). Notably, Plaintiff made no reference to the application of a "five-day rule" in its Opposition to Summary Judgment,

precluding the submission of documentary evidence.[1] (Doc. No. 18-2 at 62-86). Similarly, Plaintiff raised no objection to a lack of time for discovery.[2] (Id.). Ultimately, the ALJ and then the SRO considered Plaintiff's affidavits, written and oral arguments, and documentary evidence in reaching their summary judgment decisions in favor of CMS.

In conclusion, summary judgment is not prohibited under the IDEA, and is permitted under both North Carolina law and OAH rules as a pre-hearing dispositive motion. Thus, Plaintiff was not deprived of any due process right to present evidence and cross-examine witnesses under 20 U.S.C. § 1415(h)(2) because her claims were properly dismissed by the ALJ through summary judgment before commencement of the scheduled due process hearing.

## IV.     CONCLUSION

Under the modified *de novo* review required by the IDEA, the Court has determined that the ALJ and SRO correctly granted Summary Judgment on all counts and, as such, the decisions of the ALJ and SRO are affirmed.

**ORDER**

---

[1] M.C. v. Antelope Valley Union High Sch. Dist., No. 14-56344, a Ninth Circuit case cited by Plaintiff for the proposition that a parent is prejudiced by the "five-day rule," is inapplicable to this case. M.C. v. Antelope Valley Union High Sch. Dist., 852 F.3d 840, 845 (9th Cir. 2017). M.C. followed a full due process hearing on the merits and does not even mention the "five-day rule" in its holding. Id. at 846.

[2] The argument put forth in Section II of Plaintiff's Memorandum in Support of Summary Judgment is unavailing. Plaintiff never raised any argument that she was "precluded" from presenting documentary evidence to support her case at summary judgment. Contrary to Plaintiff's argument, in North Carolina, there is discovery in IDEA cases. See 26 NCAC 03 .0112; (Doc. No. 27 at 14). OAH rules allow parties to engage in formal and informal discovery that "shall be completed no later than the first day of the contested case hearing." 26 NCAC 03.0112. Had Plaintiff survived summary judgment, she would not have been precluded from engaging in additional discovery pursuant to OAH rules.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 24) is **GRANTED** and Plaintiff's Motion for Summary Judgment (Doc. No. 26) is **DENIED**.

Signed: August 11, 2021

Max O. Cogburn Jr.
United States District Judge